In re the MARRIAGE OF Daniel R. DEMPSTER and Dianne L. Dempster.

Daniel R. DEMPSTER, Appellant,

v.

Dianne L. DEMPSTER, Respondent.

No. 17101.

Missouri Court of Appeals, Southern District, Division One.

May 20, 1991.

Janet K. Brown, Poplar Bluff, for appellant.

Robert L. Smith, Kennedy & Kennedy, Poplar Bluff, for respondent.

PER CURIAM.

Daniel R. Dempster ("Daniel") appeals from a decree dissolving his marriage to Dianne L. Dempster ("Dianne"). He claims the trial court erred in (a) awarding the parties joint legal and physical custody of the two youngest children of the marriage, and (b) awarding Dianne the marital real estate.

The parties married each other November 6, 1971. The union produced three daughters: Stacey, born April 10, 1972; Marla, born September 16, 1980; and Codi, born March 19, 1985.

The parties separated in October, 1989. Before the breakup, they were residing in a mobile home on a 16.5–acre tract they own

in Wayne County.[1] Dianne[2] was teaching at Greenville Junior High School. Daniel was employed as a "community support worker" at the Piedmont office of Southeast Missouri Ozark Mental Health Center. Stacey was a senior at Greenville High School. Marla was a fourth-grader at Greenville.[3]

Five or six weeks before the separation, Robert Smith, a former classmate of Dianne whom she had not seen "in twenty some years," returned to Greenville for his stepmother's funeral. Dianne saw Smith at a "reunion." Two days later Smith went back to his residence in California. Dianne began telephoning him. Smith returned to Missouri the "first week in October [1989]."

There was a conflict in the evidence regarding the date and circumstances of the separation. Daniel and Stacey testified Dianne loaded some of her belongings in her automobile and moved out of the marital residence October 3.

Dianne testified the separation occurred Friday, October 6, after she arrived home from school. According to Dianne, she was preparing to attend a retirement dinner for a teacher at Poplar Bluff. Daniel asked to accompany her. She refused his request, whereupon he accused her of "going to meet another man." Then, said Dianne, "[Daniel] shoved me out of the trailer and told me that he would beat my face if I ever came back." Dianne's testimony continued:

"Q. Where did you spend the evening of October 6th then?

A. At Puxico, Missouri.

Q. With whom?

A. With Robert Smith.

Q. And October 7th, where did you spend that?

A. With Robert Smith at Puxico."

Daniel recounted he spent October 7 looking for Dianne, going twice to the home of Smith's father and also checking motels. He took all three children with him on the search.

Dianne testified Daniel "packed all my stuff and dumped it in [my mother's] garage" October 8.[4]

Before the separation the parties had agreed to buy a "double wide trailer home" to replace the mobile home in which they had lived seven years.[5] According to Daniel, the latter mobile home was to be used as part of the downpayment on the new one. Daniel explained that when "the marriage fell apart" the seller "wouldn't let us out of the deal." Realizing the seller would seize the mobile home, Daniel moved himself and the three children into a rented house in Piedmont. The parties' mobile home was seized around October 20, 1989. According to Daniel, it "was probably worth $1,500." In the aftermath of the transaction, said Daniel, "they brought charges against us." He added, "That was all settled through the attorney [who] represented us on that."

When Daniel and the children moved to Piedmont, Stacey began attending Clearwater High School there. Marla began attending Clearwater Elementary School. Codi began attending a program for four-year-olds two days a week.

Dianne moved for temporary custody and visitation rights. That motion was heard January 16, 1990.[6] At that time, according to Dianne, she was living with her parents. She added she had put "ear-

---

**1.** Daniel testified the tract is approximately two miles from Shook.

**2.** The trial court received evidence on two occasions: January 16, 1990 (hearing on Dianne's motion for temporary custody), and June 13, 1990 (trial). Dianne was 39 at the time of the first hearing; Daniel was 38.

**3.** Prior to the separation, the parties had temporarily placed Marla with Daniel's parents at

Benton because of concern that a client of Daniel might harm her. While at Benton, Marla attended school there. That arrangement lasted about a month, ending in late October, 1989.

**4.** Dianne's mother and father reside at Shook.

**5.** Daniel testified Dianne made the deal and signed his name without consulting him.

**6.** Footnote 2, *supra*.

nest money" down on the purchase of a house at Puxico.

Dianne told the trial court she was seeking temporary custody of only Marla and Codi. Dianne conceded Stacey "ought to be able to choose to reside with either [Dianne] or [Daniel] as she feels most comfortable."

Stacey, testifying at the temporary custody hearing, avowed she had no desire to live with Dianne or see her.

Marla, testifying in the presence of a guardian ad litem appointed for her and her sisters,[7] told the trial court she wanted to be with her sisters. She liked both parents and school in both Greenville and Piedmont. Marla preferred spending more time with Daniel than Dianne.

The trial court awarded Daniel primary custody of Marla and Codi pendente lite. Dianne was granted temporary custody from 5:00 p.m., Friday to 5:00 p.m., Sunday on the first and third weekends each month, and also from 6:00 p.m., to 8:00 p.m., each Wednesday. No pendente lite order was entered regarding Stacey.

At time of trial,[8] all three children were residing with Daniel in the rented house at Piedmont. Stacey had evidently graduated from high school, as (according to Daniel) she had received a tuition scholarship at Three Rivers Junior College for the fall semester, 1990. Daniel asked for permanent custody of Marla and Codi. He testified no custody order was needed for Stacey, as she had reached age 18 two months earlier.

Dianne was residing at Puxico in a house she intended to buy for $21,500. Dianne acknowledged Stacey's custody should be exclusively Stacey's decision. Dianne asked for primary custody of Marla and Codi.

Marla told the trial court she loved both parents but preferred living with Daniel. Regarding visitation with Dianne, Marla liked "the way we've been doing it."

Codi said little, but did indicate a preference for living with Daniel.

The custody order in the dissolution decree awarded the parties joint legal custody[9] and joint physical custody[10] of Marla and Codi pursuant to a "Plan of Joint Actual Custody" spelled out in the decree. § 452.375.7, RSMo Cum.Supp.1989.

The plan stated Dianne would have actual custody of Marla and Codi beginning September 1 and continuing through May 31 annually, from 6:00 p.m., Sunday through 6:00 p.m., Friday each week. During those months, Daniel would have actual custody of Marla and Codi from 6:00 p.m., Friday to 6:00 p.m., Sunday each week.

From June 1 through August 31 each year, Daniel would have actual custody of Marla and Codi from 6:00 p.m., Sunday through 6:00 p.m., Friday each week. During those months, Dianne would have actual custody of Marla and Codi from 6:00 p.m., Friday to 6:00 p.m., Sunday each week.

The plan also identified sundry holidays and provided Dianne and Daniel would have actual custody of Marla and Codi on those days on an alternating basis.

Except for ordering each party to "bear the cost and support of the minor children during that period in which the party is exercising actual custody or visitation," the decree made no provision for child support for Marla and Codi, and said nothing about custody or support for Stacey. There was,

---

7. By agreement, Daniel, Dianne and their lawyers were not present when Marla testified.

8. Footnote 2, *supra*.

9. Section 452.375.1(1), RSMo Cum.Supp.1989, provides: "'Joint legal custody' means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or· decreed, the parents shall confer with one another in the

exercise of decision-making rights, responsibilities, and authority[.]"

10. Section 452.375.1(2), RSMo Cum.Supp.1989, provides: "'Joint physical custody' means an order awarding each of the parents significant periods of time during which a child resides with or is under the care and supervision of each of the parents. Joint physical custody shall be shared by the parents in such a way as to assure the child of frequent and continuing contact with both parents."

however, a provision requiring the parties to "reasonably consult and mutually agree as to matters significantly affecting the children" in the areas of education, religious training, elective surgery, orthodontics and discipline.

Daniel's first three points relied on attack the custody order. We address the points in the sequence presented.

■ The first point maintains the custody order is not based on substantial evidence in that "both parties demonstrated that they have no ability to deal with one another."

In support of the point, Daniel reminds us § 452.375.2, RSMo Cum.Supp.1989, states the court shall determine custody in accordance with the best interests of the child. Daniel cites *Brisco v. Brisco*, 713 S.W.2d 586, 590 (Mo.App.1986), where the Western District of this Court held that before a joint custody plan can be said to be in the best interests of a child, there should be some evidence in the record to support a finding that the parents are emotionally equipped to deal with each other as equal partners in the care of the child. *Brisco* observed it is not in the best interests of a child to allow him to become a pawn between parents who are consciously or subconsciously using the child to vent their frustrations at each other.

In the instant case each side's evidence demonstrated the marriage was turbulent. Dianne testified she had been subjected to physical abuse by Daniel since the second year of the marriage. This included "[s]lapping, punching, kicking, dragging around." According to Dianne, on one such occasion her ear bled and "there was a hole in the eardrum". She added: "I've had bloody noses, bruises on my arms and I had a black eye once. I also have an indentation in my leg where I was kicked repeatedly and nerve damage and massive scar tissue." Asked how frequently such abuse occurred, Dianne replied at least once a month early in the marriage. Later, she said, there was verbal abuse in addition to physical abuse. She avowed she fought back "[o]nly in the last three to four years."

Dianne testified the last episode of physical abuse was about a week before the separation. Dianne recounted Daniel "shoved me out of the trailer and shoved me across the yard, slapped me around and knocked me down in the grass." The fracas followed an argument about the purchase of the "double wide" trailer. A year earlier, said Dianne, she and Daniel "had an argument and he had beaten me with a belt."

Daniel admitted kicking, punching and slapping Dianne, but avowed it was self-defense. Daniel acknowledged he "started a lot of the arguments," but denied initiating the violence. According to Daniel, Dianne "would strike me, she would grab me between the legs, she'd do anything." Daniel testified Dianne "jerked" his neck in February, 1987, rupturing a disc and requiring surgery.

Daniel described himself as six feet one inch tall, weighing 190 pounds. Astonishingly, when asked whether Dianne was about five feet three inches tall and weighed 100 pounds, he professed not to know. He added: "You don't know this woman when she's angry, sir. This woman is very violent. If I did not restrain her, pen [sic] her to the floor, put her down, hold her down, I never in eighteen years, she's never had to go to the hospital for any injury I ever give her. She never filed any assault charge."

There was evidence the children were exposed to the marital strife. Dianne testified the children were almost always present during the verbal abuse (profanity and obscene name-calling). Dianne added Stacey witnessed Daniel kicking Dianne when Stacey was 16.

Daniel admitted using "vulgar language in front of the children." However, said Daniel, Dianne did too. Daniel described an incident where Dianne "took a salt filet knife [and] threatened to stab me when I was sitting at the kitchen table with it in front of the children." According to Daniel, "The two little ones went in the bathroom and hid and shut the door."

To synopsize all the evidence of marital combat would extend this opinion to unacceptable length. What we have set forth is a representative sample of the dismal narrative filling some 325 pages of transcript.

Daniel maintains the physical and verbal battles confirm he and Dianne will be unable to discuss and agree on the subjects listed in the joint custody plan. Furthermore, says Daniel, there are other examples of the parties' "inability to get along."

First, there was the dispute over the mobile home transaction where Dianne "forged" his name on the contract.[11] Second, Daniel testified at the pendente lite custody hearing he was taking the children to church regularly. Third, Daniel testified at the same hearing he had taken Marla to a psychotherapist. Daniel asserts Dianne was unaware of the "Second" and "Third" circumstances.

■ The standard of review in Rule 73.-01(c),[12] as construed by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976), applies to custody determinations. *Griffin v. Griffin*, 789 S.W.2d 236, 236–37 (Mo.App. 1990); *Petty v. Petty*, 760 S.W.2d 555, 556[2] (Mo.App.1988); *R_____ v. R_____*, 685 S.W.2d 598, 601[1] (Mo.App. 1985). The decree of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Applying this standard to Daniel's first point, we observe that while the record is replete with instances of verbal and physical brawls between the parties, there is evidence they have no disagreement over the children's religious training or their education. Daniel was raised a Catholic and both parties have taken the children to Catholic churches. The children attended public schools before and after the parties separated, and there is no indication either party wants to place the children in private or parochial schools.[13]

There was also no evidence the parties disagreed over the children's medical care.

Additionally, Daniel testified at trial he had twice allowed Dianne time with Marla and Codi beyond the requirements of the pendente lite order. Although the parties' animosity toward each other had not abated at time of trial, they nonetheless complied with the pendente lite order during the five months preceding trial. Additionally, Daniel testified that after the order was entered, Dianne phoned the children "just about every day" without interference by him.

While it would be foolish to assume all future contacts between the parties will be harmonious and free of acrimony, we cannot say the record is bare of substantial evidence that the parties have no ability to deal with each other about the rearing of Marla and Codi. Daniel's first point is denied.

■ His second point asserts the joint custody order is erroneous in that the weight of the evidence showed it was in the best interest of Marla and Codi for him to have "primary custody." He asserts Dianne was abusive to the children, the children had done well residing with him, and the children wanted to remain with him.

Daniel directs us to his testimony that Dianne had slapped Marla "up side the head" on occasions when Marla "was running late for school," and to Stacey's testimony that Dianne grabbed her (Stacey) by the hair and choked her during a quarrel about washing the dishes. Daniel also emphasizes evidence Dianne once "took a handful" of pills in an apparent suicide attempt, requiring medical attention.

Dianne admitted taking the pills, but explained she did so after Daniel whipped her with the belt.

The above evidence raises concern about Dianne's stability. However, there was

---

11. Footnote 5, *supra.*

12. Rule references are to Missouri Rules of Civil Procedure (1991).

13. Marla attended parochial school during the month she was with Daniel's parents at Benton. Footnote 3, *supra.*

also negative evidence about Daniel. Dianne testified that "at the beginning of school" circa 1987, Daniel and Stacey had an argument and Stacey threatened to leave home. Dianne quoted Daniel as saying it would be fine if Stacey left, but "she'd better not come back, ever, he'd kill her." Stacey departed and stayed with Dianne's parents three weeks.

Stacey verified the incident, stating Daniel had a gun in his hand when it occurred. She recalled Daniel saying he "would kill anyone who tried to take his kids away."

Additionally, Dianne testified Daniel complained of sundry ailments during the marriage, once fearing he had genital herpes and on another occasion believing he had AIDS. According to Dianne, medical tests for both conditions were negative.

There was also evidence that during the final five years of the marriage Daniel attempted to prevent the children from seeing Dianne's parents.

■ The trial court made no findings of fact on the custody question. Consequently, all fact issues shall be considered as having been found in accordance with the result reached. Rule 73.01(a)(2); *In re Marriage of Hall*, 801 S.W.2d 471, 472[2] (Mo.App.1990); *In re Marriage of Baldwin*, 780 S.W.2d 368 (Mo.App.1989); *In re Marriage of Clark*, 718 S.W.2d 649, 653[2] (Mo.App.1986).

Daniel refers us to the eight statutory factors in § 452.375.2, RSMo Cum.Supp. 1989, which courts must consider in custody determinations. He endeavors to demonstrate the weight of the evidence on those factors establishes he "should have been granted primary legal and physical custody." Dianne responds by attempting to show the weight of the evidence on each factor was, if anything, more favorable to her. Each party's brief exaggerates the evidence favorable to such party.

■ In determining whether the custody order is against the weight of the evidence we are mindful that in this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial judge, who was free to believe none, part, or all of their testimony. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988). We assume the trial court believed the testimony and evidence consistent with its decree. *Paramount Sales Co., Inc. v. Stark*, 690 S.W.2d 500, 501[3] (Mo.App.1985); *McComas v. Umlauf*, 641 S.W.2d 809, 812[5] (Mo.App.1982); *McClelland v. Williamson*, 627 S.W.2d 94, 96[2] (Mo.App.1982). On credibility issues, we may not substitute our judgment for that of the trial court, which is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as other intangibles which may not be completely revealed by the record. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455[9] (Mo. banc 1984); *State ex rel. Webster v. Cornelius*, 729 S.W.2d 60, 65[5] (Mo.App.1987).

Here there was evidence which, if believed, could have made the trial court uneasy about granting either party full custody of Marla and Codi. The joint custody plan places their physical custody with Dianne approximately 221 days per year and with Daniel approximately 144 days. Neither party has physical custody longer than five consecutive days. This arrangement has the practical feature of enabling each parent to promptly detect any improper treatment of the children by the other parent. It also enables the children to be in the same home during the five school days each week.

Given the options available to the trial court, we cannot say the custody order is against the weight of the evidence or unsupported by substantial evidence, nor can we find the trial court erroneously declared or applied the law. An opinion reciting all the evidence favorable and unfavorable to each party on the custody issue would have no precedential value. Accordingly, the custody order is affirmed in compliance with Rule 84.16(b). Daniel's second point is consequently denied.

■ His third point asserts the custody order is erroneous in that the trial court "failed to make a specific finding that a weekly custody shuttle is in the best inter-

ests of the children." Daniel cites *Bashore v. Bashore*, 685 S.W.2d 579 (Mo.App.1985).

We find that case inapposite, as the custody order there preceded the changes in § 452.375 defining joint legal custody and joint physical custody. Furthermore, the custody order there placed the children with one parent one week and with the other parent the next week, and alternately thereafter.

The custody order in the instant case awards each parent significant periods of time during which Marla and Codi reside with such parent, as provided in § 452.375.1(2), RSMo Cum.Supp.1989. Moreover, the custody order does this in a sensible way which does not disrupt school days. Where parents live apart, there is no way to provide for joint physical custody other than by transferring children from one parent to another at designated times. If there is to be "frequent and continuing contact with both parents," as specified in § 452.375.1(2), transfers are inevitable. As noted by Dianne, there is no more a "custody shuttle" in this case than there would be if she had full actual custody and Daniel had temporary custody on weekends. Daniel's third point is denied.

■ Daniel's final point maintains the trial court erred in awarding Dianne the marital real estate (the 16.5–acre tract on which the mobile home sat before it was seized).

Daniel estimated the fair market value of the tract at $26,000. It was encumbered by a lien in favor of a bank securing a $23,000 debt. Dianne placed the value of the tract at $28,000.

In dividing the marital property, the trial court awarded each party specific items and assigned each party the responsibility for paying specific debts.[14] Daniel makes no effort to demonstrate the net aggregate value of the marital property awarded him was significantly lower than that awarded Dianne.

■ A trial court is vested with considerable discretion in dividing marital property and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Dardick v. Dardick*, 670 S.W.2d 865, 869[5] (Mo. banc 1984).

We find no abuse of discretion here. The division of marital property is supported by substantial evidence and is not against the weight of the evidence, and no error of law appears. An opinion setting forth all items of marital property, their respective values, and itemizing the debts would have no precedential value. Accordingly, the division of marital property is affirmed in compliance with Rule 84.16(b). Daniel's fourth point is denied.

The decree of dissolution of marriage is affirmed.

---

**14.** Dianne was assigned, among other debts, the one on the 16.5 acres and the one owed the lawyer who represented her and Daniel in the mobile home litigation.