Charles D. MATTHEWS, V, Christopher Matthews, and Melissa Ellen Matthews, Appellants,

v.

J. Handy MOORE and Dorothy M. Moore, Respondents.

No. 19975.

Missouri Court of Appeals, Southern District, Division Two.

Dec. 1, 1995.

C.H. Parsons, Jr., Dennis Wilson, Parsons, Wilson & Satterfield, P.C., Dexter, for appellants.

W. Edward Reeves, Ward & Reeves, Caruthersville, for respondents.

CROW, Judge.

■ The lessees of an apple orchard abandoned it and were sued by the lessors for rent that allegedly became due thereafter. The trial court heard the case without a jury and entered judgment for the lessees, unembellished with findings of fact or conclusions of law. The lessors appeal.

We preface our analysis of the claims of error with an account of the facts. In narrating them, we accept as true the evidence and inferences from it favorable to the trial court's judgment and disregard contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[2] (Mo. banc 1989).

There are three lessors: Charles D. Matthews, V; Christopher D. Matthews; Melissa Ellen Matthews.[1] They are siblings. We henceforth refer to them collectively as "Plaintiffs."

There are two lessees: J. Handy Moore and Dorothy M. Moore, husband and wife ("Defendants"). Dorothy Moore ("Dottie")[2]

is a sister of the Plaintiffs' father, who died in 1974.

The orchard comprises approximately 90 acres situated within a tract of approximately 1,000 acres known as "the Hodge Farm." In 1978, Plaintiffs and Dottie owned the Hodge Farm and numerous other tracts of real estate "jointly." The testimony of Plaintiff Charles D. Matthews, V ("Matt") revealed the background:

"Q. Can you explain ... how you acquired ownership in this property ...?

A. It was all inherited property. Some came from my father's interest, some came from my great-grandmother's interest, and some came from my great-aunt's estate."

Asked whether Dottie "had the same interest" in the properties as Plaintiffs, Matt replied, "Generally, yes."

In "1978 or '79," Plaintiffs and Defendants began negotiating to divide the properties, "trying to balance out acres and values and in an effort to basically separate [their] affairs." The negotiations culminated in a comprehensive and complex "Memorandum of Agreement" signed June 16, 1981.

The agreement divided the Hodge Farm, with Plaintiffs receiving part and Dottie receiving the other part. The orchard lay in the part received by Plaintiffs. The agreement provided, among other things, that Plaintiffs would lease the orchard to Defendants "for a term of 15 years at an annual rental per acre equal to the amount of average crop rental computed in an annual cash rent figure, which the Hodge Farm would have paid for the year next preceding."

The orchard had existed since 1970 or 1971, when Defendant J. Handy Moore ("Handy") planted it. He testified he did so pursuant to a lease with "the Virginia Lemons estate." He explained:

"[T]hat was to keep the value of the property out of the Lemons estate. It was to remove it in case of or in the

---

1. At the time the lease was signed (June 16, 1981), Melissa Ellen Matthews was a minor. The lease was signed for her by Janice J. Matthews, guardian of Melissa's estate.

2. For brevity and clarity, meaning no disrespect, we henceforth refer to each participant in this dispute by forename, surname or nickname appearing in the record.

event of the owner dying, that the property—the value, the added increment would be taxed to me and not to Virginia Lemons.... And then when she died, it became the people that subsequently were the owner. And, of course, as long as I paid the rent, I kept my interest in that improvement. And my understanding was when we negotiated that if I didn't pay the rent, I lost my interest in it. That was the understanding.

Q. And the lease was then—

A. It was null.

Q. So you had an option to protect your investment?

A. I had to pay the rent.

Q. You had to pay the rent. But if you wanted to lose your investment and let the owners of the land have the investment—

A. All I had to do was not pay the rent.

Q. Not pay the rent. Then they would get the improvements, the orchard.

A. And I had lost it. That was the understanding."

Handy avowed he invested "over $100,000 in the orchard."

Simultaneously with signing the "Memorandum of Agreement" on June 16, 1981, Plaintiffs and Defendants signed a document captioned "Orchard Lease Agreement." [3] The latter document ("the lease") designated Plaintiffs as "Landlord" and Defendants as "Tenant." The lease was "for a term commencing January 1, 1981, and expiring December 31, 1996." It provided, among other things:

"3. The Tenant further covenants and agrees:

(a) To use the premises for orchard purposes only.

. . . .

(c) To retain possession of the premises during the term hereof and not to assign or sublet without the Landlord's written consent.

. . . .

7. The non-payment of any rental when due or the abandonment of the leased premises shall act as a forfeiture of the balance of the term of this lease, and

Landlord may enter the premises and take possession of same immediately."

Defendants subsequently assigned their interest in the lease to Morning Sun Orchards, Incorporated, a corporation in which Handy was a shareholder. Morning Sun, managed by Tom Adkins, operated the orchard and paid rent to Plaintiffs through 1986. Handy recounted that Adkins departed near the end of 1986, whereupon Handy told Plaintiffs that Defendants were no longer going to operate the orchard.

Defendants paid Plaintiffs no rent after 1986. In the summer of 1987, Plaintiffs received a letter from Defendants' lawyer stating Defendants "had chosen to abandon the lease." Despite Defendants' abandonment, the orchard produced apples in 1987. Handy testified:

"We told the Matthews boys that there was a crop of apples out there. There were apples on the trees, and we said it would be a shame for those apples to just fall on the ground.... I think I talked to Matt and said, 'We will try to salvage that crop and turn over whatever proceeds it makes to you.' Nobody was doing anything with them.... [I]t looked like maybe there was some money that could be salvaged. I had tried to help Matt to find management for the orchard.... And I thought if there was some possibility of making some money off of [the apples], that would be fine. We would do that and turn the money over to them. That's—So there were some apples out there, and they were picked.... There was no money.... The apples didn't sell for enough to pay for the harvest, for the cost of getting them out. There was no money, and they were informed of that."

After the 1987 harvest, Defendants engaged in no further activity on the orchard. In the winter of 1987–88, Plaintiffs "attempted to hire a successor operator," but were unsuccessful. In the fall of 1988, Plaintiffs decided they "would enter and again operate the orchard" themselves.

Over Defendants' objection that the testimony was immaterial, the trial court permit-

---

**3.** Footnote 1, *supra.*

ted Matt to testify that in negotiating the division of the Hodge Farm and other tracts, Handy was unwilling to take the part of the Hodge Farm where the orchard lay. Consequently, said Matt:

> "[T]he compromise ... was that the orchard, which had previously been leased from my Aunt Virginia's estate, would then be leased from my brother and my sister and I as landowners. And that, we would be no worse off by having taken the land because we would have a lease for 15 years. And that would pay us crop income based on the average crop rental income for the entire farm, not that particular piece of property."

Matt added that Defendants represented to him that the lease "would equalize out the trade that [I] had, in effect, agreed to in the [Memorandum of Agreement]."

Handy, called as a witness by Plaintiffs, testified on direct examination that the lease provided that if Defendants abandoned the orchard, they were not obligated to pay Plaintiffs any future rent. Handy's testimony:

> "Q. Now, was it the paragraph in the lease that you relied on as No. 7 that you believed gave you the right to just abandon this farm without suffering any consequences?
>
> A. I negotiated that paragraph. I negotiated every element of that contract with Bob Matthews.[4] And my understanding was exactly that, that the orchard was a valuable commodity; and if anybody turned that over, they did so and forfeited the property. And that's exactly what was intended when we wrote it. We did not intend to have any liquidating [sic] damages or we would have specified that. We simply said if I don't come up with the rent in March, that I lost the apples, which I spent a lot of money on...."

Handy also testified that after Defendants told Plaintiffs that Defendants were abandoning the orchard, he asked Matt whether he (Matt) wanted Handy to "cut the trees off" so the orchard could be converted to "row crop land." Handy quoted Matt as saying he "did not want to cut them off."

The first of Plaintiffs' four points relied on reads:

> "The trial court erred in denying damages to Plaintiffs because a common sense interpretation of paragraph 7 of the lease agreement, considered together with the other lease provisions, the provisions of the Memorandum of Agreement, and the parties' intent, did not allow the Defendants to terminate the lease simply by failing to pay rent when due or abandoning the lease [sic] premises."

In the argument following the point, Plaintiffs maintain that "the terms of the lease agreement are ambiguous." Therefore, say Plaintiffs, in determining whether the lease allowed Defendants to abandon the orchard without liability to Plaintiffs for future rent, a court may consider, among other things, the construction the parties themselves placed on the lease by their acts and deeds, together with other external circumstances which cast light on the parties' intent.

In adjudicating Plaintiffs' first point it is unnecessary to decide whether they are correct in insisting that the lease is ambiguous regarding whether Defendants could abandon the orchard during the term of the lease without liability for future rent. We shall assume, without deciding, that the lease is ambiguous about that.

Additionally, although we are uncertain whether a court in resolving the ambiguity may, in the circumstances here, consider "the parties' intent," we shall assume, arguendo, that Plaintiffs are correct in believing a court may do so.

The difficulty in considering the parties' intent is that Matt's testimony on the issue of intent did not coincide with Handy's testimony.[5] As we have seen, Matt testified the intent was that Defendants occupy the orchard and pay rent for the entire 15–year term. Handy testified the intent was that Defendants could abandon the orchard be-

---

4. Matt testified Bob Matthews was Matt's "great-uncle." Handy described Bob as "the farm man."

5. Only three people testified: Matt, Handy and Plaintiff Christopher D. Matthews. Christopher did not testify about his intent regarding paragraph 7 of the lease.

fore expiration of the 15-year term, and if they did so they relinquished the opportunity to earn profits from Handy's $100,000 investment in the orchard for the remainder of the term, but had no liability to Plaintiffs for rent after abandonment. Plaintiffs would gain possession of the orchard and an opportunity to earn a profit from the trees planted and paid for by Handy. In that regard, Handy testified it takes "about four to five years for [apple trees] to come into bearing," and they "will bear for 40 or 50 years." When Defendants abandoned the orchard, the trees evidently had some 30 productive years left.

█ The trial court apparently found Handy's testimony on the issue of intent more persuasive than Matt's. That was the trial court's prerogative. In this court-tried case, credibility of witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988). On appeal in a court-tried case, an appellate court defers to the trial court on factual issues because it is in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455[9] (Mo. banc 1984). We assume the trial court believed the testimony consistent with its judgment. *In re Marriage of Dempster*, 809 S.W.2d 450, 456 (Mo.App.S.D.1991); *McComas v. Umlauf*, 641 S.W.2d 809, 812[5] (Mo.App.S.D. 1982).

█ Our review is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (1995), as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1].

Accepting, arguendo, Plaintiffs' premise that the lease is ambiguous and the trial court could properly determine its meaning from evidence regarding the parties' intent, we hold Handy's testimony sufficient to support the trial court's implicit finding that the lease permitted Defendants to abandon the orchard before expiration of the 15-year term without liability to Plaintiffs for rent after abandonment.

As reported earlier, Handy testified he originally planted the orchard when the tract was owned by "the Virginia Lemons estate." He invested some $100,000 in planting the trees on land he did not own, but was willing to accept the risk so long as he could keep possession of the orchard by paying rent. However, it is reasonable to assume that ten years later, when he negotiated the lease with Plaintiffs, Handy did not want to obligate Defendants to fifteen years of rental payments if, during that period, the orchard became unprofitable.[6] He wanted to ensure that Defendants could, by paying rent, operate the orchard for fifteen years if it was profitable, but could walk away sooner instead of operating the orchard at a loss.

There was evidence that the orchard had value when Defendants abandoned it. As noted earlier, Handy testified Matt did not want the trees removed to convert the parcel to row crop land.

The trial court could have reasonably found that in negotiating the lease, the parties recognized that if Defendants abandoned the orchard before expiration of the 15-year term, Plaintiffs would receive the benefit of

---

6. The lease between Plaintiffs and Defendants did not peg the rent on the orchard's productivity. The lease provided:

"The Tenant agrees to pay to Landlord on March 1st of each year an annual rental which shall be calculated as follows: The crop rental which the entire Hodge Farm would have paid for the year next preceding shall be determined and then divided by the number of acres in said farm to obtain a per acre rental figure. Crop rental is to be calculated in the same manner that crop rentals on the Hodge Farm were computed during the years of 1977 through 1979, wherein the Landlord received one-third of all crops grown on said farm (except cotton which is one-fourth); the only crop expense of the Landlord being the payment of one-third of the fertilizer. . . . The per acre rental figure obtained as hereinabove shall be multiplied by the number of surveyed acres in the leased premises to obtain the annual rental figure to be paid by Tenant."

each remaining productive year of the trees planted and paid for by Handy, consequently the parties did not intend that Defendants pay rent after abandonment. In that regard, it will be recalled that the lease required Defendants to use the premises for orchard purposes only, thereby ensuring that the trees would be there when Defendants departed.

We repeat, for emphasis, that we have accepted, arguendo, Plaintiffs' premise that the lease is ambiguous and the trial court could properly determine its meaning from evidence regarding the parties' intent. Given Handy's testimony on that subject, which the trial court apparently believed, we reject Plaintiffs' contention that the trial court erred in construing the lease favorably to Defendants and adversely to Plaintiffs on the issue of whether Defendants had the right to terminate the lease by abandoning the orchard. Plaintiffs' first point is denied.

Plaintiffs' second and fourth points are based on the premise that Defendants had no right to terminate the lease prior to expiration of the 15–year term. Our rejection of that premise in denying Plaintiffs' first point is fatal to their second and fourth points.

 Plaintiffs' third point, the only one left, reads:

"The trial court erred in finding the issues in favor of Defendants and against Plaintiffs because Plaintiffs were entitled to damages against Defendants for the 1987 rent in that Defendants retained possession of the apple orchard in 1987 to the extent that Handy Moore caused the apples to be harvested and sold."

We have carefully examined Plaintiffs' petition, the trial transcript, and the "Post–Trial Brief" submitted by Plaintiffs to the trial court after presentation of the evidence. We have found no place where Plaintiffs presented to the trial court the theory set forth in their third point.

Plaintiffs' theory in the trial court was that Defendants breached the lease by abandoning the orchard and failing to pay rent after 1986. Plaintiffs never claimed that Handy's effort to salvage the 1987 crop for Plaintiffs'

7. Handy's testimony about that was uncontradicted. As that testimony was consistent with the trial court's judgment, we assume the trial

benefit[7] instead of allowing it to fall to the ground rendered Defendants liable for rent in 1987.

 An appellate court reviews a case upon only the theory tried, and a party will be held to that theory on appeal. *Mid–West Management Trust v. Stillman Land Co.*, 888 S.W.2d 368, 369[2] (Mo.App.S.D.1994). An appellant may not, on appeal, rely on a different theory than he presented to the trial court. *Kiener v. Powell*, 865 S.W.2d 864, 867[6] (Mo.App.S.D.1993). Consequently, Plaintiffs' third point is ineligible for review.

Judgment affirmed.

PREWITT, P.J., and SHRUM, C.J., concur.

court believed it. *Dempster,* 809 S.W.2d at 456; *McComas,* 641 S.W.2d at 812[5].