**MO–KAN CENTRAL RECOVERY CO.,**
**Petitioner/Appellant,**

v.

**Carl HEDENKAMP,**
**Defendant/Respondent.**

**No. WD 34993.**

Missouri Court of Appeals,
Western District.

May 22, 1984.

---

Patrick B. Starke, Blue Springs, for petitioner/appellant.

Robert M. Adams, Kansas City, for defendant/respondent.

Before SHANGLER, P.J., and KENNEDY and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

Appellant Mo-Kan Central Recovery Company ("Mo-Kan") is in the business of repossessing automobiles and trucks owned by third-party debtors on behalf of its clients who are foreclosing on their security interests. Respondent Carl Hedenkamp formerly was employed by Mo-Kan. Mo-Kan sought to enjoin its former employee's alleged breach of a restrictive covenant in which Hedenkamp had agreed not to compete with Mo-Kan's business within a fifty-mile radius of the Kansas City, Missouri city limits for a period of two years following termination of his employment. This appeal follows the trial court's denial after hearing, of preliminary and permanent injunctive relief. The court's judgment will be sustained unless it erroneously declares or applies the law, unless it is against the weight of the evidence, or unless no substantial evidence supports it. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); Rule 73.01.

Mo-Kan, incorporated since 1978, operates ninety percent of its business within fifty miles of the Kansas City metropolitan area. According to Purdom, its president, Mo-Kan differs from other repossession businesses because it has the capability to enter and start vehicles without the use of keys. Automobile credit institutions often use in-house personnel for relatively easy repossessions but must look to outside help when keys are not available, or the cars to be repossessed either cannot be located, or are not accessible to tow trucks. Mo-Kan alleges it exists to fill those needs.

Gaining entrance to cars without the aid of keys requires specialized tools,

such as the "slimjim," which are not generally available to the public. Mo-Kan's evidence was vague on this point. Purdom claimed certain states (not Missouri) have laws restricting the public's general access to these tools. The tools are available from commercial distributors. Mo-Kan holds no patents on the design of any of the tools it uses[1] nor did it design, develop, or manufacture any of the tools.

Mr. Purdom testified that "business procedures" and "business techniques," including a price list and bidding sheet, have been developed as a result of Mo-Kan's five-year experience in the business of repossessing cars. Counsel posed the question, "Could you give the court a value on what the common sense aspects of this job, this business ... is worth?" to which Purdom replied he could not. Ricky Greisom, the vice-president of Mo-Kan, testified that Mo-Kan's "pricing structure" was a confidential piece of information within the company. Mo-Kan's clients appear in public directories, however. Its pricing policy is also known to its clients because repossession costs are added to the backpayments which the debtor must pay in order to redeem repossessed cars.

Respondent Carl Hedenkamp was hired by Mo-Kan in October of 1982 and began working full time a month later. He quit some 1½ months later in mid-January, 1983 and started his own repossession business. Hedenkamp came to Mo-Kan with a total of 3½ years prior work experience in this business. He had worked for two different automobile credit companies as an account representative, where his duties included repossessing cars and collecting delinquent accounts.

On December 1, 1982, Hedenkamp signed two employment contracts with Mo-Kan. The first covered certain administrative duties such as answering the phone, for which he would receive a weekly salary. His wife did this work. The contract in question, labeled an "Independent Employee Contract," covered his duties of repossessing cars, for which he would receive 25% of Mo-Kan's repossession bill as commission.

The pertinent contract language included the following:

WHEREAS, in connection with Employer's repossession business, it has a number of valuable customer lists and other contracts and secrets within the knowledge of Employer which Employer intends to retain and restrict in connection with any of its employees, subject to lawsuits and penalty;

\* \* \* \* \* \*

Employee, as well as Employer, expressly acknowledge that this employment involves a disclosure of Employer's trade secrets, research information, mailing lists, customer lists and other information of a very valuable nature; said information obviously must be accessible to Employee in his handling of corporate affairs. Under the circumstances, Employee agrees that at the end of this contract, or as might be sooner terminated by Employer with the 20-day notice described in the paragraph four above, he will not in any form or manner compete with Employer for a period of two (2) years within a fifty mile radius of the Kansas City, Missouri city limits, as now designated. Competition with Employer, as indicated, means working for a like or similar recovery or repossession-type business on any income basis, and/or owning or having any involvement with any such business.

It is undisputed that Hedenkamp received some training from Mo-Kan. Greisom testified he taught respondent how to use its specialized tools and Mo-Kan's "techniques" for repossessing cars. Greisom did not specify what these "techniques" involved but when asked by his counsel, "Are there certain techniques you

---

1. The lack of a patent on the tools is not fatal to Mo-Kan's claim of trade secret. In fact, had a patent been obtained the manner and process of making the tools must necessarily be revealed upon application for patent protection and the element of secrecy is thereby lost. *See Carboline Company v. Jarboe,* 454 S.W.2d 540, 550 (Mo.1970).

use in order to prevent yourself from getting caught," Greisom answered, "Just common sense." Hedenkamp testified that after December 1 when the employment contracts were signed he received no further training. He also stated at his former employment he had access to key guns used to cut keys, and had previously used "slimjims."

Hedenkamp testified that the business atmosphere at Mo-Kan appeared pessimistic shortly before he quit. The possibility of bankruptcy, as well as of dropping a major account, was contemplated. In mid-January he began competing with Mo-Kan. He bought a tow truck, got a Mo-Kan employee to work for him, and purchased some of the same tools used at Mo-Kan through contacts made at his employment there. He obtained all of his repossession business from two former clients of Mo-Kan, one of which he had previously worked for, and the other he claimed had contacted him. In two months Hedenkamp had repossessed forty-eight cars for his two clients.

■ Missouri law recognizes that a temporally and spatially limited restraint on an employee's ability to compete with his former employer will be enforced in equity if reasonable under all of the attending circumstances and if enforcement serves the employer's legitimate protectible interest. *See Deck and Decker Personnel Consultants, Ltd. v. Pigg*, 555 S.W.2d 705, 708 (Mo.App.1977); *Herrington v. Hall*, 624 S.W.2d 148, 151 (Mo.App.1981). This opinion assumes without deciding that the covenant in question was reasonable under the circumstances. The dispositive issue as presented by the parties in this appeal involves whether or not Mo-Kan has a legitimate interest in which a court of equity will protect through the enforcement of the terms of the restrictive covenant. In this area Missouri courts limit the granting of equitable protection to two narrowly defined classes of employer interests, customer contacts and trade secrets, both of which Mo-Kan claims in its brief. *See Continental Research Corporation v. Scholz*, 595 S.W.2d 396, 400 (Mo.App.1980); *Orchard Container Corporation v. Orchard*, 601 S.W.2d 299, 303 (Mo.App.1980). Covenants of the kind here involved were first regarded by the courts as contrary to public policy and held to be in restraint of trade. *Renwood Food Products, Inc. v. Schaefer*, 240 Mo.App. 939, 223 S.W.2d 144, 150 (1949). Later the courts recognized the necessity of restrictive covenants in employee contracts, but held the employer is not entitled to freedom per se from competition. The threat of competition ceases to be a real danger, "unless it is accompanied by a knowledge of trade secrets learned by the employee during his employment, or an influence acquired by the employee over the customers of his employer." *Renwood, supra*, 223 S.W.2d at 151 (citation omitted). "This has led the courts to deny relief unless one of those elements is present." *Renwood, supra*, 223 S.W.2d at 151. *See USA CHEM, Inc. v. Lewis*, 557 S.W.2d 15, 22 (Mo.App.1977) (an essential element to the contract is showing the restriction is for the protection of the employer's business and good will); *Continental Research Corp., supra*, at 401 (employer may only 'fairly require' protection in narrow and well-defined interests of trade secrets and customer contacts). In sum, the restraint must be qualified as to time and space and not greater than required for the protection of the person whose benefit it is imposed. *Renwood, supra*, 223 S.W.2d at 151.

■ At oral argument, however, Mo-Kan abandoned its asserted interest of maintaining its customers. At the heart of this appeal is whether Mo-Kan had a protectible interest in its bidding structure, techniques for the repossession of cars including a "locater system," and use of specialized tools, all of which it labels as "trade secrets." The definition of trade secrets is found in Restatement of Torts, § 757 and adopted in *National Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 18–19 (Mo. banc 1966):

b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and

which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... [I]t is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.... Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use.... Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the ex-

tent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

The burden of proof rested upon Mo-Kan to substantiate its asserted interest in its trade secrets as defined in the Restatement. *See National Rejectors, Inc.*, 409 S.W.2d at 18.

■ The mere existence of some non-defined "bidding structure" does not establish a trade secret. Mo-Kan provided the court with no evidence that its bidding structure (how much it would charge a customer) represented some novel or complicated approach to bidding for clients which could not easily be duplicated by others. Nor did Mo-Kan ever describe what security measures were taken to maintain the necessary element of secrecy, other than conclusory testimony, which the court was not bound to believe, that its pricing structure was a "confidential piece of information." *Compare Carboline Company v. Jarboe, supra,* 454 S.W.2d at 542.

Similar infirmities exist with regard to Mo-Kan's claim that its "techniques" for repossession of cars constitute a trade secret. The thrust of the evidence describing these techniques was that they were a combination of common sense and experience. These generalized assets lack the particularity of a "formula, pattern, device or compilation of information," as described in the Restatement's definition of trade secrets. Mo-Kan cannot take common sense from the public domain of ideas and preserve it as a trade secret for its exclusive use. *See* Alexander, Commercial Torts § 3.2 at 210 (1973).

Mo-Kan did produce testimony that others in the repossession business did not utilize the same techniques used by it and instead were limited to repossessing vehi-

cles when a duplicate key was available. It does not necessarily follow that other repossession businesses (who actually were Mo-Kan's clients rather than competitors) farm out their more complicated or dangerous repossession work to Mo-Kan only because they could not do the job themselves if they so chose. This alone does not establish a trade secret. The record contains no mention whatsoever, and therefore this opinion need not make further mention of, the "locater system" as described in Mo-Kan's brief.

Mo-Kan terms its third claimed trade secret as a "methadology" and in some cases the very existence of its specialized repossession tools. These tools were entered into evidence as Exhibits 1 and 2, although they were not provided to this court on appeal. Mo-Kan's main complaint appears to be that these tools generally are difficult to obtain from commercial distributors and that Hedenkamp gained a contact through his employment at Mo-Kan which helped him purchase the tools to compete against Mo-Kan. They also complain that Hedenkamp received training in the use of these specialized tools. It should first be noted the restrictive covenant makes no mention of any tools. Even assuming the agreement covered Hedenkamp's training in the use of these tools, Mo-Kan did not design, develop, nor manufacture any of its tools, nor exert any independent efforts to create any unique "methadology" that any other business using the repossession tools would not also implement. *See National Rejectors*, 409 S.W.2d at 19. Mo-Kan attempts to elevate the scarce availability of the tools to the level of a trade secret; however, this particular attribute appears more a function of the tools' potential use for criminal or other illicit activities rather than Mo-Kan's efforts to guard the source of their acquisition. For instance, Hedenkamp's duties as described by Mo-Kan would not normally have included knowing where Mo-Kan bought its tools.

In short, the bulk of Mo-Kan's proof consisted of conclusory testimony concerning its asserted trade secrets. Its evidence of its "bidding structure," "repossession techniques," and use of tools for opening and starting vehicles was insufficient to establish them as trade secrets. Mo-Kan's evidence was so general on these topics, determining whether Hedenkamp was actually utilizing Mo-Kan's purported "trade secrets" in competition with it was impossible. *See Carboline Company v. Jarboe*, *supra*, at 549. For these reasons, Mo-Kan failed to establish as trade secrets either its bidding structure, repossession techniques or tools; it therefore lacked a sufficient legitimate protectible interest as the basis for the restrictive covenant to be enforced. The trial court's refusal to enjoin Hedenkamp from engaging in a similar repossession business in competition with his former employer was not against the weight of the evidence, and was supported by substantial evidence. Mo-Kan's first point is denied.

■ After the close of the evidence, Judge Mauer asked both parties if they had additional evidence to present. The parties both responded they did not, and agreed to submit the case on the merits as a request for a permanent rather than preliminary injunction. The court requested trial briefs. Along with its trial brief Hedenkamp filed a "Sworn Statement of Facts" basically summarizing in affidavit form parts of Carl Hedenkamp's testimony. Along with its trial brief Mo-Kan filed an affidavit of Purdom, its president. In its order denying injunctive relief, the court specifically noted that its judgment excluded from consideration the post-trial affidavit of Purdom but made no mention of Hedenkamp's sworn set of facts. In not mentioning Hedenkamp's affidavit the trial court implicitly concluded that the affidavit contained no new facts not already presented at trial. The same could not be said of Mo-Kan's submitted affidavit. The affidavit attempted to develop additional evidence concerning the competitive advantage of Mo-Kan's bidding structure and its repossession tools, and the circumstances surrounding the signing of the employment contracts. It did not request leave to reopen its case and even had such a request

been made, the trial judge could hardly have been convicted of an abuse of discretion after Mo-Kan had agreed no additional evidence would be presented. Mo-Kan's point of prejudicial treatment on the post-trial affidavits is denied.

Given the disposition of its first point relating to the lack of a protectible interest, Mo-Kan's third point relating to the lack of an adequate remedy at law need not be considered.

The judgment is affirmed.

All concur. ·