980 F.2d 743
 27 U.S.P.Q.2d 1692
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
John H. ERNSTER and Excelpro, Inc., Plaintiffs/Cross-Appellants,
v.
RALSTON PURINA CO. and Van Camp Seafood Co., Inc.,
Defendants-Appellants,
and
Deltown Chemurgic Corporation, Defendant-Appellant.
 Nos. 91-1270, 91-1271 and 91-1281.
 United States Court of Appeals, Federal Circuit.
 Oct. 13, 1992.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined Nov. 25, 1992.
 
 Before RICH, ARCHER and RADER, Circuit Judges.
 RADER, Circuit Judge.
 
 DECISION
 
 1
 Appellants Ralston Purina Company, Van Camp Seafood Company, Inc. (collectively Ralston), and Deltown Chemurgic Corporation (Deltown) appeal from the judgment of the United States District Court for the Eastern District of Missouri. The district court entered judgment, based on jury verdicts, for validity, willful patent infringement, "conspiracy to commit patent infringement," trade secret misappropriation, intentional interference with business relations (against Deltown only), unjust enrichment, and fraud (against Ralston only). Because on this record no reasonable jury could have reached this result, this court reverses the judgments of infringement and willful infringement. Because of a mistake of law, this court reverses the judgment of "conspiracy to commit patent infringement." Because appellees did not produce sufficient evidence to support the state law claims, this court reverses the judgments of trade secret misappropriation, intentional interference with business relations, unjust enrichment, and fraud.
 
 BACKGROUND
 
 2
 The patents at issue in this appeal, United States Patent Nos. 4,363,820 ('820), 4,545,933 ('933), and 4,600,588 ('588), all to Ernster, involve the hydrolysis of proteins, such as casein, and the use of hydrolyzed proteins as additives when canning tuna fish. Casein is the major protein in cows' milk. Addition of hydrolyzed casein improves the quality of canned tuna fish.
 
 
 3
 Hydrolysis of proteins breaks peptide bonds, the chemical bonds that link amino acids together to form a protein. Reacting an acid or a base with a protein, in the presence of water, causes hydrolysis. Hydrolysis also results by reacting the protein with an enzyme.
 
 
 4
 Hydrolysis of proteins--the addition of water and an acid or a base to the protein--necessarily affects the pH of the combination. A pH of 7 indicates a neutral solution. An acidic solution has a pH less than 7; a basic solution, greater than 7.
 
 
 5
 The '820 patent describes a process for canning tuna fish with hydrolyzed casein. Claim 1 specifies: adding treated casein (hydrolyzed with one of the bases sodium hydroxide or potassium hydroxide) to a quantity of tuna fish in a container, sealing and heating the container, then allowing the container and its contents to cool. Claims 2-11, which depend on claim 1, limit the pH of the hydrolyzed casein combination to a minimum of 8.5 (claims 2 and 3) or 10 (claims 4-11).
 
 
 6
 The '933 patent describes a process for preparing the hydrolyzed casein compound for the '820 patent's canning process. The claims expressly state that the hydrolyzed compound is neither sodium caseinate nor potassium caseinate.[1] Independent claim 1 and its dependent claims have no pH limitations. Independent claims 9 and 21 and their dependent claims require the addition of sodium hydroxide or potassium hydroxide to the casein in sufficient quantity to raise the pH of the compound to at least 10. Independent claim 12 and its dependent claims cover an edible compound that has an anionic (basic) pH. Claim 19 further requires that the compound have a pH of at least 10.
 
 
 7
 The '588 patent describes hydrolyzing casein with one of two specific enzymes. All of the claims at issue require one of the two enzymes to hydrolyze the casein.
 
 
 8
 In 1984, Mr. Ernster began selling his tuna fish additive to Ralston. Ralston, seeking another source for the product, contacted Deltown. Deltown examined the Ernster patents and developed a substitute for the product, which it began selling to Ralston in late 1986. Mr. Ernster brought this action against Ralston and Deltown in September 1987. Ralston and Deltown filed motions for directed verdict, which the district court denied. After the jury returned verdicts in Mr. Ernster's favor on all but the breach of contract claim, Ralston and Deltown filed motions for judgment notwithstanding the verdict. The district court denied these motions.
 
 DISCUSSION
 
 9
 Infringement and Validity of the Three Patents
 
 The '820 Patent
 
 10
 As noted above, this patent discloses a process for preparing canned tuna fish. Claims 1-11 are at issue.
 
 Claim 1
 Claim 1 reads:
 
 11
 A process for preparing and storing tuna fish flesh for consumption which comprises:
 
 
 12
 treating casein with a compound, selected from the group consisting of sodium hydroxide and potassium hydroxide, in the presence of water; adding a quantity of the treated casein and a quantity of tuna fish flesh to a sealable container; sealing said container; heat treating said sealed container at a temperature sufficient to prevent spoilage of said flesh; and then cooling said container.
 
 
 13
 This language claims the process of adding treated casein to tuna fish during canning.
 
 
 14
 On April 21, 1970, Japanese Patent Publication No. 1970-11099 (the Japanese patent)--entitled the "Method of Production of Canned Foods"--issued. The Japanese patent disclosed the use of caseinates to improve the quality of a canned product. In particular, the Japanese patent described suppression of crystal formation within the canned product. This prior art also noted benefits in the use of "dispersed caseinates with excellent nutrition value and taste."
 
 
 15
 The Japanese patent anticipates claim 1. A prior art reference anticipates a claim when the reference discloses every limitation of the claim. Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d 1570, 1574, 227 USPQ 177, 179 (Fed.Cir.1985). The Japanese patent discloses using sodium caseinate during canning. The record reveals that the mixture of casein with water and either sodium hydroxide or potassium hydroxide is, and has been, the traditional way to prepare sodium caseinate. The Japanese patent discloses placing tuna and sodium caseinate in sealable containers, heating those containers in a retort, and letting them cool. Thus, the Japanese patent discloses every limitation of claim 1, rendering claim 1 invalid by anticipation.
 
 
 16
 On this record, no reasonable jury could have found claim 1 of the '820 patent valid. Accordingly, this court reverses the judgment that appellants did not prove claim 1 invalid.
 
 Claims 2-11
 
 17
 Claim 2 claims the process covered in claim 1 wherein "the combination of said casein, said compound and said water has a pH of at least 8.5." Claims 3-11 depend from claim 2. The accused product has an overall pH of approximately 7, putting the product outside the coverage of claims 2-11. Mr. Ernster notes that by sifting the accused product, one can retrieve portions with a pH of at least 8.5. According to Mr. Ernster, this fact brings the accused product within claims 2-11.[2]
 
 
 18
 Claims 2-11, however, do not place the "pH of at least 8.5" limitation on a sifted-out "portion" of the casein combination. Rather the claims cover a "combination" which has a pH of at least 8.5. As such, claims 2-11 do not read on the accused product. Because no reasonable jury, applying properly interpreted claims, could have found infringement of claims 2-11 of the '820 patent, this court reverses that determination.
 
 The '933 Patent
 
 19
 The '933 patent discloses a "Hydrolyzed Protein Composition and the Process Used in Preparation Thereof." The jury found that Ralston and Deltown infringed every claim of the '933 patent, except for claim 8.
 
 
 20
 Each independent claim (claims 1, 9, 12, 21) of the '933 patent includes the limitation that the claimed hydrolyzed protein "is not sodium or potassium caseinate" or "an alkali metal caseinate." To determine the meaning of a limitation, a court looks to the specification and the prosecution history. See E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1438, 7 USPQ2d 1129, 1135 (Fed.Cir.), cert. denied, 488 U.S. 986 (1988).
 
 
 21
 As filed, Mr. Ernster's claims recited a "process for preparing a hydrolyzed protein from casein" without any negative limitations. (Jt.Ex.Vol. I at 253-57.) The examiner rejected all claims as either anticipated or obvious in light of United States Patent No. 3,389,131, to Van Horn. Van Horn's patent teaches the hydrolysis of casein for food products. Van Horn hydrolyzes the casein with an alkali metal compound. (Jt.Ex.Vol. I at 265, 269.)
 
 
 22
 In response to the rejection, Mr. Ernster filed an amendment on April 9, 1985. Mr. Ernster argued that Van Horn limited his hydrolyzed protein to sodium caseinate. (Jt.Ex.Vol. I at 276.) Thus, Mr. Ernster amended the '933 patent to add the negative limitation, "and wherein said hydrolyzed protein is not sodium or potassium caseinate." Id. Furthermore, Mr. Ernster differentiated the "hydrolyzed protein" in his claims from sodium caseinate on the basis of its pH:
 
 
 23
 6. The composition of the above identified application [644,022] further differs from sodium caseinate with respect to both its pH and its viscosity. The pH of sodium caseinate is essentially neutral; whereas the pH of the composition of the above identified application is very alkaline, varying slightly from batch to batch depending upon the pH of the water utilized in processing the same. But it, generally, is of the order of at least pH 10.
 
 
 24
 (Jt.Ex.Vol. I at 274) (emphasis added). Mr. Ernster also stated:
 
 
 25
 It is very evident that U.S. [Patent No.] 3,389,131 teaches the preparation of alkali metal caseinates and nothing more. In column 2, at lines 26 and 27, it is noted that "my product has a pH of about 6.8 to 7 ...". This simply is not the product of Applicant's disclosure which is anionic in character....
 
 
 26
 (Jt.Ex.Vol. I at 282) (emphasis added). Due to this amendment, the examiner allowed Mr. Ernster's claims. (Jt.Ex.Vol. I at 325.)
 
 
 27
 This prosecution history reveals that Mr. Ernster distinguished his process from prior art on the basis of the pH of product resulting from his process. In sum, Mr. Ernster limited the process covered by the '933 patent to a process yielding compositions with a pH of at least 10. Deltown's product, however, has a neutral pH. Thus, Deltown's accused process does not infringe the '933 patent.
 
 
 28
 A patentee may not adopt a claim interpretation disavowed during prosecution. Jonsson v. Stanley Works, 903 F.2d 812, 817-18, 14 USPQ2d 1863, 1868 (Fed.Cir.1990). Mr. Ernster's 1985 amendment clarifies the meaning of the phrase "hydrolyzed protein [which] is not sodium or potassium caseinate." To distinguish his process from Van Horn's, Mr. Ernster equated "sodium caseinate" with neutral pH and rephrased his claims to exclude coverage of processes yielding proteins with neutral pH. Deltown's product is essentially neutral with a pH of approximately 7. Mr. Ernster's patent does not encompass Deltown's process.
 
 
 29
 Mr. Ernster again argues that Deltown's process infringes the '933 patent because, when "sifted," portions of Deltown's product have a pH in the range of 10. At oral argument, Mr. Ernster claimed that "many" of the claims of the '933 patent recite a "reaction mixture," as opposed to the entire contents of the "reaction vessel." Mr. Ernster argued that this "reaction mixture" corresponds to the portion of the Deltown product with a pH in the range of 9.5-10.5.
 
 
 30
 The claims of the '933 patent, however, do not refer to a "reaction mixture." Process claims 9-11 require addition to the "reaction vessel" of a "quantity of said compound [sodium or potassium hydroxide] in said [aqueous] solution sufficient to raise the pH of said reaction vessel to at least pH 10 upon the addition of said compound...." (Emphasis added.) Composition claims 12-19 are limited to a composition [having] an anionic pH to render it with a bitter ammonia like flavor." (Emphasis added.) Claim 19 is further limited to a composition having "a pH greater than pH 10." Process claims 21-24 require a "quantity of said compound sufficient to raise the pH of the contents of said reaction vessel to at least pH 10. (Emphasis added.) Process claims 1-7 and 20, while not containing an express pH limitation, include the "not a sodium or potassium caseinate" limitation which Mr. Ernster used in prosecution history to distinguish his work from products with a neutral pH.
 
 
 31
 In sum, every claim in the '933 patent contains some limitation--either express or evident from the prosecution history--to a pH of approximately 10. Nothing in the '933 patent indicates that the phrases "reaction vessel" and "contents of the reaction vessel" mean anything other than the contents as a whole. The pH claim limitations in the '933 patent refer to the pH of the entire hydrolyzed protein product, not to the pH of sifted portions of the product.
 
 
 32
 Although a patentee may be his own lexicographer, when the patent contains no alternative definition for a claim term, the term is given its ordinary meaning. See United States v. Telectronics, 857 F.2d 778, 782, 8 USPQ2d 1217, 1220 (Fed.Cir.1988), cert. denied, Telectronics v. United States, 490 U.S. 1046 (1989). The claims of the '933 patent do not break the composition into portions for measurement of pH. Therefore, because the Deltown product has a neutral pH, its process cannot infringe the '933 patent.
 
 
 33
 Properly interpreted, the claims of the '933 patent do not read on the accused process. Because no reasonable jury, applying properly interpreted claims, could have found infringement of any of the claims of the '933 patent, this court reverses.
 
 The '588 Patent
 
 34
 The '588 patent describes a milk protein hydrolysate and the process for preparing the hydrolysate. Each of the claims at issue--1, 2, 5-9, and 11--contains a limitation requiring an "acid fungal protease derived from controlled fermentation of Aspergillus niger " and "a protease prepared from purified cultured liquid obtained from Bacillus subtilis." The accused process and product uses enzymes derived from Mucor miehei and Mucor pusillus. These enzymes sell under the name of Hannilase and Emporace. Because the '588 patent does not literally encompass the accused process or product, the jury must have found infringement under the doctrine of equivalents.
 
 
 35
 The doctrine of equivalents, however, cannot recapture for the patentee matter disclaimed during prosecution of the patent or matter in the prior art when the patent issued. Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985). During prosecution of the '588 patent, the examiner rejected the application under 35 U.S.C. § 103 (1988). The examiner noted that particular enzymes were matters of choice not critical to the invention. Mr. Ernster responded:
 
 
 36
 Just any enzyme is simply not equivalent to those specified in Applicant's claims. Just any enzyme, whether it be the enzymes of Oberg at al or the enzymes of Wingerd et al, do not yield compounds or products of processes which have the same properties as Applicant's composition of matters, and the products of Applicant's processes.
 
 
 37
 (Jt.Ex.Vol. I at 520.) Mr. Ernster also declared:
 
 
 38
 One of the critical steps of Applicant's process is the use of [the disclosed enzymes.] Such a critical step is not found in the processes of [the prior art]....
 
 
 39
 (Jt.Ex.Vol. I at 523.) Thus, Mr. Ernster emphasized the importance of the specific enzymes listed as limitations in the '588 patent.
 
 
 40
 Moreover, Kranenburg's United States Patent No. 4,259,357, prior art to the '588 patent, specifically taught enzymatic hydrolysis of casein with Hannilase and Emporace. These are the precise enzymes used in the accused process and product. Prosecution history estoppel prevents Mr. Ernster from acquiring coverage for matter in the prior art and for matter he specifically disclaimed during prosecution.
 
 
 41
 No reasonable jury could have found the properly construed claims of the '588 patent to cover the accused process. Therefore, this court reverses the finding of infringement of the claims of the '588 patent.
 
 Patent Conspiracy
 
 42
 Because this court finds that appellants' processes and products do not infringe any valid claims of Mr. Ernster's patents, this novel theory fails as a matter of fact. Moreover, this court discerns no legal basis for this count in Mr. Ernster's complaint. The Patent Act permits suits to redress infringement. 35 U.S.C. § 271, 281 (1988). If an infringer acts willfully, which might include involvement in a conspiracy, the Act permits a court to treble damages. 35 U.S.C. § 284 (1988). Title 35 neither expressly nor implicitly authorizes additional and duplicative damages for conspiracy to infringe a patent. Cf. Bonito Boats v. Thunder Craft Boats, 489 U.S. 141 (1989).
 
 Trade Secret Claims
 
 43
 Mr. Ernster alleges at least nineteen trade secret violations under Missouri law. The Missouri Supreme Court has held:
 
 
 44
 The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret.... [A trade secret proprietor] may likewise communicate it to others pledged to secrecy.... Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.... Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information....
 
 
 45
 National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 19 (Mo.1966) (en banc). Furthermore, failure to take meaningful steps to preserve the secrecy of a trade secret is fatal to a claim of trade secret misappropriation. Id. at 22-24. The party asserting trade secret misappropriation has the "burden of establishing that it had protectable trade secrets." Id. at 24; accord Carboline Co. v. Jarboe, 454 S.W.2d 540, 549 (Mo.1970); Mo-Kan Cent. Recovery Co. v. Hedenkamp, 671 S.W.2d 396, 400 (Mo.Ct.App.1984). More than conclusory testimony is needed to show existence of a protectable trade secret. Mo-Kan, 671 S.W.2d at 400-01. Bald assertions that a confidential relationship exists with a client are insufficient to establish a trade secret. National Rejectors, 409 S.W.2d at 24.
 
 
 46
 The record in this case discloses no evidence of the security measures taken to protect Mr. Ernster's "secrets." See National Rejectors, 409 S.W.2d at 22-24 (signed confidentiality agreement control over alleged secret); Mid-States Paint & Chem. Co. v. Herr, 746 S.W.2d 613, 618 (Mo.App.1988) (customers not given complete formula). The record does not show measures such as keeping formulae guarded and in a locked safe, accounting for employee notebooks, prohibiting employee disclosure of formulation to outsiders, prohibiting outsiders from entering laboratories, prohibiting laboratory employees from lunching with suppliers, requiring employees to sign confidentiality agreements, and requiring employees to protect trade secrets both during and after employment. See Carboline, 454 S.W.2d at 549. In sum, appellees did not supply sufficient evidence to support possession of any protectable trade secret.
 
 
 47
 Patent disclosures further compromise many of Mr. Ernster's alleged secrets. For example, Mr. Ernster's patents disclose the quantity of tuna to use in a 6.5 ounce can, canning process steps, and information about the advantages of those patented processes. These revelations are no longer secret at all.
 
 
 48
 Mr. Ernster also alleges that trade information books disclosed trade secrets to Ralston. These books, however, contained no confidential markings. Rather, Mr. Ernster himself distributed the books to prospective customers. The record contains no evidence that Mr. Ernster retained control over the books in the hands of customers or prospective customers.
 
 
 49
 In sum, Mr. Ernster did not show that his alleged secrets were secret at all or that he took steps to ensure their secrecy. Under applicable Missouri law, no reasonable jury could have found that Mr. Ernster possessed trade secrets. Therefore, this court reverses the judgment of trade secret misappropriation.
 
 
 50
 Wrongful Interference with Business Expectancies
 
 
 51
 The jury found that Deltown wrongfully interfered with Mr. Ernster's expectation of a continued business relationship with Ralston. The jury also found, however, that no contract existed between Ralston and Mr. Ernster. To prevail on this claim, Mr. Ernster must prove that Deltown lacked justification for its alleged interfering act. American Business Interiors v. Haworth, Inc., 798 F.2d 1135, 1144 (8th Cir.1986). Fair competition in the marketplace does not give rise to a sustainable claim of wrongful interference. The United States Court of Appeals for the Eighth Circuit, whose law applies on this count, states:
 
 
 52
 Competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.
 
 
 53
 Henry v. Chloride, Inc., 809 F.2d 1334, 1351 (8th Cir.1987).
 
 
 54
 The record shows that Deltown was an active competitor in the market. The record discloses, however, nothing beyond this legal competitive conduct. Once again, this record does not contain sufficient evidence to convince any reasonable jury that Deltown wrongfully interfered with appellees' business expectations. Accordingly, this court reverses the judgment against Deltown on this wrongful interference count.
 
 Unjust Enrichment and Fraud
 
 55
 Mr. Ernster's unjust enrichment and fraud claims are based upon misappropriation of trade secrets. Because unable to present substantial evidence to show existence of any trade secrets, Mr. Ernster cannot prevail on these theories. Therefore, in the absence of any trade secrets, this court reverses the judgment on these counts as well.
 
 CONCLUSION
 
 56
 For the reasons stated above, this court reverses the judgments against Ralston and Deltown for patent infringement, "conspiracy to commit patent infringement," trade secret misappropriation, intentional interference with contractual or business relationship, unjust enrichment and fraud. This court also reverses the jury's determination on the validity of claim 1 of Ernster's '820 patent. This court vacates as moot the trial court's determination on the validity of the remaining claims of Mr. Ernster's patents. Because this court reverses the judgments against appellants, it need not address Mr. Ernster's cross-appeal. Accordingly, this court remands with instructions to lift the injunction on appellants' activities and to enter judgment for appellants consistent with this opinion.
 
 COSTS
 
 57
 Each party to bear its own costs.
 
 
 
 [1]
 Sodium caseinate and potassium caseinate are salts. Under certain reaction conditions, the addition of an acid or a base, and water, to a protein may result in the formation of a salt, rather than a hydrolyzed protein. In this case, treatment of casein with an aqueous solution of dilute sodium hydroxide or potassium hydroxide probably would result in the formation of sodium caseinate or potassium caseinate. Treatment with a more concentrated solution of sodium hydroxide or potassium hydroxide would result in the hydrolyzed protein
 
 
 [2]
 This argument contradicts Mr. Ernster's position during prosecution of Application No. 644,022, a continuation-in-part of the parent of this patent. Ernster argued for considerations of the pH of the total contents of the reaction vessel, not isolation of parts: "There is a difference between having pH of the total contents of the reaction mixture ... and simply the pH of unreacted alkali metal." (Jt.Ex.Vol. I at 285.)