**WEST GROUP BROADCASTING, LTD.,
a Missouri Corporation, Plaintiff–
Respondent,**

**v.**

**Danielle M. BELL, Defendant–Appellant.**

No. 20785.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 11, 1997.

Motion for Rehearing and Transfer
Denied March 5, 1997.

William J. Fleischaker, Roberts, Fleischaker, Williams, Wilson & Powell, Joplin, for defendant-appellant.

John S. Dolence, Spencer, Scott & Dwyer, P.C., Joplin, for plaintiff-respondent.

SHRUM, Judge.

West Group Broadcasting, Ltd. ("West") operates three radio stations in the Joplin area, one of which is KXDG. On January 30, 1995, West hired Danielle M. Bell ("Bell") as an announcer for KXDG. The contract of employment included this provision:

"[T]he Employee agrees that in the event ... she resigns or is otherwise terminated ... from ... her employment with the Employer, the Employee will not compete with the Employer in any way within a 65 air mile radius from the tower location of the Employer's radio station in Joplin/Webb City, Missouri, within a period of 180 days from resignation or termination of employment."

We henceforth refer to that provision as "the noncompete covenant."

On September 1, 1995, Bell left West's employment. On October 9, 1995, she began employment as an announcer at KSYN in Joplin, a radio station operated by Big Mack Broadcasting, Inc. ("Mack").

West promptly sued Bell and Mack seeking, *inter alia*, an injunction enforcing the noncompete covenant. After hearing evidence, the trial court issued a preliminary injunction.

Six weeks later, the trial court heard further evidence to determine whether a permanent injunction should be issued. At the start of that hearing, West dismissed the suit as to Mack.[1] The trial court thereafter issued a permanent injunction barring Bell from "[e]ngaging in any employment in the broadcast industry prior to February 29, 1996, within a 65 air-mile radius from West Group's tower location in Joplin, Missouri."

Bell brings this appeal from that injunction.

After briefing was completed, this court noted the injunction had expired. This court thereupon issued an order directing Bell to show cause why the appeal should not be dismissed as moot.

In response, Bell pointed out that the preliminary injunction required West to post a $1,500 bond conditioned on payment by West of all damages and costs incurred by Bell in the event the preliminary injunction was dissolved without issuance of a permanent in-

---

1. West's lawyer told the trial court that West and Mack had "resolved their differences among themselves."

junction. *See* Rule 92.02(c).[2] Bell insisted that if this court were to hold the permanent injunction should not have been issued, West's liability on the bond "remains a viable issue."

There are at least two cases which suggest West might be liable on the bond if this court were to hold the trial court erred in granting West injunctive relief. They are: *R.A. Vorhof Construction Co. v. Black Jack Fire Protection Dist.*, 454 S.W.2d 588, 595–96 (Mo. App.1970), and *Brunswick Corp., Mercury Marine Div. v. Hering*, 619 S.W.2d 950, 952 (Mo.App.1981). Accordingly, there is still a ripe issue. The case is not moot and we will decide the issues on the merits. *See Hering*, 619 S.W.2d at 952.

The scope of our review in this judge-tried case is set forth in Rule 73.01(c) as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo.banc 1976). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Analysis of Bell's claims of error requires an account of the facts. In narrating them, we are mindful that credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo.banc 1988). We assume the trial court believed the testimony consistent with its judgment. *Tubbs v. Delk*, 932 S.W.2d 454, 455[2] (Mo.App.1996); *Matthews v. Moore*, 911 S.W.2d 664, 668[3] (Mo. App.1995). Consequently, we accept as true the evidence and inferences from it favorable to the judgment and disregard contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[2] (Mo.banc 1989).

So viewed, the evidence establishes that during her employment by West, Bell became the regular "disc jockey" on the "seven-to-midnight show," broadcasting under the

name "Hurricane Hannah." The format, i.e., the type music played, was "hot country." As Hurricane Hannah, Bell worked by herself without a co-announcer. Asked to describe her show, Bell explained she played recorded music, talked about the recording artists and other subjects, received telephone calls from listeners, and conversed with the callers on the air. At the time she left West's employ, the "Arbitron ratings" showed she had the "number-one rating" in the Joplin metropolitan market for her time slot.

Advertisers pay West to broadcast commercial messages during KXDG's programs. The amount of money West charges the advertisers is based on the number of people who listen to KXDG. That number is established by the Arbitron ratings. If the ratings show an increase in the number of KXDG's listeners, West raises the advertising rates; if the ratings show a decrease in listeners, West lowers the rates. As succinctly explained by Paul Swint, general manager of West's stations in Joplin, "[L]isteners mean ratings, and ratings mean dollars."

Upon commencing employment at KSYN (39 days after leaving KXDG), Bell was assigned the 5:30 until 10:00 a.m. shift, broadcasting news (which she wrote), conversing with the show's male host (who played recorded "contemporary" music), and participating with him in answering telephone calls from listeners. At KSYN, Bell broadcasted under the name "Robin Kane."

Bell's first point relied on asserts:

"The trial court erred in ... enjoining ... Bell from engaging in any employment in the broadcast industry prior to February 29, 1996, within a 65 air-mile radius from ... West Group's tower location in Joplin, Missouri because said judgment was not supported by any substantial evidence in that the evidence ... failed to show that ... West ... had any legally protectable 'customer contacts' which enti-

**2.** Rule references are to Missouri Rules of Civil Procedure (1996).

tled it to enforce its covenant not to compete with ... Bell by enjoining her from working as an announcer for a competitor."

Analysis of this point must proceed with these principles in mind.

■■ Covenants by employees not to compete with their employers after termination of employment are no longer contrary to public policy in Missouri, yet they still are not favored in this state. *Furniture Mfg. Corp. v. Joseph*, 900 S.W.2d 642, 647[8] (Mo.App.1995). Such covenants are carefully restricted because they deal with restraints on commerce and limit an employees's freedom to pursue his or her trade. *Universal Underwriters Ins. Co. v. Lyon*, 896 S.W.2d 762, 764[2] (Mo.App.1995) (citing *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo.banc 1985)). The following general rule still attends: An employer cannot extract an enforceable restrictive covenant merely to protect himself from the competition of an employee. *Herrington v. Hall*, 624 S.W.2d 148, 151[1] (Mo.App.1981). Accordingly, even when restrictive covenants on future employment are reasonable spatially and temporally, they are enforceable only if a legitimate protectable interest of the employer is served. *Id.*

■■ An assessment of the reasonableness of a covenant not to compete requires a thorough consideration of surrounding circumstances, which includes the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business. *Herrington*, 624 S.W.2d at 151[3]. The issue of reasonableness is one of law according to the subject matter of the agreement and the existing circumstances. *House of Tools and Engineering, Inc. v. Price*, 504 S.W.2d 157, 159[5] (Mo.App.1973).

One of the cases cited by Bell in support of the point is *Grebing v. First National Bank of Cape Girardeau*, 613 S.W.2d 872 (Mo.App. 1981). There, in discussing covenants by employees not to compete with their employers after termination of employment, the court declared:

"The determination of reasonableness depends upon the competing needs of the parties as well as the needs of the public. These needs are: (1) the employer's need to protect legitimate business interests, such as trade secrets and customer lists, (2) the employee's need to earn a living, and (3) the public's need to secure the employee's presence in the labor pool[.]"

*Id.* at 874[2, 3].

Enforcement of such covenants is also discussed in *Mo–Kan Central Recovery Co. v. Hedenkamp*, 671 S.W.2d 396 (Mo.App.1984), another case cited by Bell. There, we learn:

" ... Missouri courts limit the granting of equitable protection to two narrowly defined classes of employer interests, customer contacts and trade secrets[.] ... The threat of competition ceases to be a real danger, 'unless it is accompanied by a knowledge of trade secrets learned by the employee during his employment, or an influence acquired by the employee over the customers of his employer.' ... 'This has led the courts to deny relief unless one of those elements is present.' "

*Id.* at 399.

■■ Upon thorough review of this record in light of the above principles, we are convinced that Bell's first point has merit when it asserts that West failed to present any substantial evidence that it had a legitimate protectable interest to be served by enjoining Bell from working at KSYN. Bell asserts— and West concedes—that Bell acquired no trade secrets from West. The only evidence that Bell might exploit KXDG's customers came from KXDG general manager, Swint. He asserted that Bell's voice was, "very recognizable," that radio audiences might recognize her voice, and her fans could "go from one station to another." In our view, that is not evidence of customer lists or influence as discussed in *Grebing*, 613 S.W.2d. at 874, and *Mo–Kan Central Recovery Co.*, 671 S.W.2d. at 399, and is not sufficient to support an

absolute restraint on Bell's freedom to pursue her trade.

In reaching this conclusion, we do not ignore West's arguments that the "customer contacts" analyses in the cases cited by Bell do not fit situations where an employer is in the broadcasting business and its employee is an announcer who acquires a corps of listeners while in the employer's service.

West concedes it is unaware of any Missouri case addressing the enforceability of a covenant not to compete in regard to a "broadcast personality." It cites us, however, to *Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 296 S.E.2d 566 (1982), and *T.K. Communications, Inc. v. Herman*, 505 So.2d 484 (Fla.App.1987), cases which enforced covenants not to compete in the broadcast industry.

In *T.K. Communications*, disc jockeys Herman and McBean, a popular morning team at WSHE, moved to WGTR, a rival station. WGTR specifically utilized the names and reputations of Herman and McBean to solicit advertisers and to attract listeners before the expiration of the noncompetition period. 505 So.2d at 485. During the noncompetition period, Herman and McBean also engaged in activities such as: helping WGTR in recruitment of local personalities and WSHE employees, explaining the production of their former WSHE show to WGTR's program director, and playing recordings of their WSHE show for WGTR personnel. *Id.* With the facts so explained, the Florida court then concluded:

> "WSHE has shown it has no adequate remedy at law. The breach consists of intangibles that cannot be replaced by money damages; for instance, the use of the disc jockeys' valuable names and reputations and the capitalization on the disc jockeys' popularity. McBean even admitted that the defendants' names, reputations, and popularity were 'significant' and of 'unique value' and would be of a 'special value' to WGTR."

*Id.* at 486.

In the Georgia case, Johnny Beckman, a well-known Atlanta television personality,

left station WSB–TV for station WXIA–TV. Beckman sought a declaratory ruling that his noncompetition covenant with WSB–TV was invalid. Beckman argued that he developed and maintained his television personality with his own skills and resources. *Beckman,* 296 S.E.2d at 569. Therefore, he insisted that he could take his television personality to another station without interference from WSB–TV. *Id.* In rejecting that argument, the Supreme Court of Georgia found that WSB–TV had made an investment in Beckman's image as part of its own image, and was entitled to protect its own image by reasonably-tailored restrictions. *Id.*

The facts of *T.K. Communications* and *Beckman* are not the facts of this case. At KXDG, Bell was an announcer whose only name recognition was as Hurricane Hannah. She worked in the 7:00 p.m. to midnight spot with a country music format. As Hurricane Hannah, Bell worked by herself without a co-announcer. In addition to playing music, she talked about the artists and took telephone calls. Although West created Hurricane Hannah as Bell's radio personality and used its resources to promote Hurricane Hannah as part of KXDG's image, there is no evidence that at KSYN Bell ever used or attempted to capitalize on that personality or name recognition. The only things that Bell took with her and used when she went from KXDG to KSYN were her aptitude, skill, mental ability, and the voice with which she was born. At KSYN, Bell assumed a new name, Robin Kane. She worked a different time slot, 5:30 a.m. to 10:00 a.m.; and was merely a co-host with a male announcer. At KSYN, she read the news and bantered with the cohost. The music on KSYN, which was announced by Robin Kane's co-host, was contemporary music, not the country format of KXDG.

The announcers in *T.K. Communications* were enjoined from capitalizing on the popularity and name recognition of "Herman and McBean" developed at the expense of a former employer. The employee in *Beckman* was enjoined from capitalizing on the image and name recognition of "Johnny Beckman"

developed at the expense of his former employer. In this case, Bell, without the mantle of Hurricane Hannah, was enjoined from capitalizing on her own skill, talent and voice. As we see it, both the Florida case and the Georgia case are too factually dissimilar to aid in deciding this case.

Continuing, we do not ignore the dissent's assertions that the analysis in *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 401 (Mo.App.1980) is apropos to this case. The *Continental* court said:

> "[I]n the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative. The sales employee is thus frequently in a position to exert a special influence over the customer and entice that customer's business away from the employer. An employer may properly protect itself against such an eventuality for a reasonable period of time."

*Id.* at 401. We agree that the analysis in *Continental* would be persuasive if Bell had used or attempted to use the Hurricane Hannah radio personality to exert special influence over Joplin area radio listeners and, in that fashion, adversely affected West's advertising revenue by diverting listeners from KXDG to KSYN. However, as recounted above, Bell did nothing at KSYN to capitalize on the image of the radio personality developed for her at KXDG.

After careful examination of this record and assessment of the distinctive circumstances revealed therein, we are convinced that West did not prove it had a legitimate protectable interest to be served by preventing Bell from working at KSYN. We hold that the enforcement of this restrictive covenant was not reasonable under the circumstances.

The judgment of the trial court is reversed.

PARRISH, J., concurs.

CROW, P.J., dissents in separate opinion.

CROW, Presiding Judge, dissents.

I respectfully dissent.

The majority opinion holds West "did not prove it had a legitimate protectable interest to be served by preventing Bell from working at KSYN."

It must be remembered that the trial court did not bar Bell from working at KSYN in perpetuity. The noncompete covenant West asked the trial court to enforce provided only that Bell would not compete with West within a 180–day period following termination of employment.

Bell left West's employment September 1, 1995, and began employment at KSYN October 9, 1995. The preliminary injunction was issued November 22, 1995. By then, 81 days of the noncompete period had passed. Bell had worked at KSYN for 43 of those 81 days in violation of the covenant.

The permanent injunction expired February 29, 1996. Thus, the modest relief granted by the trial court barred Bell from employment in the broadcast industry in the Joplin area for only 99 days. After that, she was free to work at KSYN or for any other broadcaster.

The majority opinion acknowledges that a reviewing court assumes the trial court believed the testimony consistent with its judgment; consequently, the reviewing court accepts as true the evidence and inferences from it favorable to the judgment and disregards contrary evidence.

Evidence favorable to the judgment included testimony by Paul Swint, general manager of West's stations in Joplin, that Bell's voice is "very recognizable" and her fans "can go from one station to the other."

Barry Wendt, a disc jockey at KXDG at the time of Bell's departure, testified that after she left he "happened to run into her downtown at a restaurant." Wendt recounted, "She mentioned that she had some news probably wouldn't make me too happy, and it didn't, but that she was going to work for ...

Mr. Dunaway."[1] Wendt continued, "I asked about the noncompete at the time, and she said that Chuck will take care of it, or Chuck said he will take care of it."

Describing his reaction to Bell's disclosure, Wendt said: "I was unhappy, because she's a valuable employee, and I knew that she was going to hurt us, because she had good ratings on our station, and I didn't want her taking that following over to his station .... as soon as she hit the air—she's very talented, and I knew that that would hurt us."

In *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 401 (Mo.App. E.D.1980), the court said:

> "[I]n the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative. The sales employee is thus frequently in a position to exert a special influence over the customer and entice that customer's business away from the employer. An employer may properly protect itself against such an eventuality for a reasonable period of time."

Although that passage deals with a sales representative, the analysis is apropos here. Because of the popularity Bell developed with listeners while broadcasting at KXDG, she was in a position to entice listeners away from KXDG to KSYN when she began broadcasting there. As pointed out by disc jockey Wendt: "I do the midday show, and [Bell] does the morning show over there [at KSYN]. So usually your morning is your lead into your midday show, so if people go over there and listen to her in the mornings, they might stay there middays."

The majority opinion recognizes that if a radio station's listeners increase, its advertising rates rise; if its listeners decrease, its advertising rates fall. Consequently, even though Bell had no personal contact with West's advertisers, it is obvious she could adversely affect West's advertising revenue by diverting listeners from KXDG to KSYN when she began broadcasting there.

The majority opinion agrees that the analysis in *Continental, supra,* would be persuasive if Bell had used or attempted to use the Hurricane Hannah radio personality to exert special influence over Joplin area radio listeners and, in that fashion, adversely affected West's advertising revenue by diverting listeners from KXDG to KSYN. However, the majority opinion says Bell did nothing at KSYN to capitalize on the image of the radio personality developed for her at KXDG.

The majority's analysis ignores evidence favorable to the judgment. Charles Dunaway[2] testified there are approximately 224 radio markets larger than the Joplin market. Given the relatively small size of the Joplin market, it is readily inferable that although Bell began broadcasting at KSYN as Robin Kane, the audience she developed at KXDG would recognize her on KSYN as Hurricane Hannah, to whom they had listened a few weeks earlier on KXDG.

There is evidentiary support for that inference. KXDG's general manager, Swint, testified that the first day Bell was on the air at KSYN, three or four people reported to him that "Hannah's working on KSYN." Swint added, "I heard her myself."

West's evidence showed noncompete covenants are common in the broadcasting industry. The Georgia and Florida cases discussed in the majority opinion demonstrate that is so. The noncompete covenant Bell signed when West hired her is similar to the covenants in those cases as to geographical area and duration.

The majority opinion relies on factual differences between the instant case and the Georgia and Florida cases as justification for allowing Bell to violate the noncompete covenant. To me, those differences are only in degree, not substance.

---

**1.** Charles R. Dunaway is part owner of Mack, which operates KSYN.

**2.** Footnote 1, *supra.*

While Bell may not have attained the celebrity status of the announcers in the Georgia and Florida cases, she was unquestionably able to attract a sizeable audience, as demonstrated by the Arbitron ratings. The evidence, viewed favorably to the judgment, amply demonstrates West had a financial interest in keeping those listeners tuned to KXDG instead of following Bell to a competing station upon her departure.

Enforcing the noncompete covenant would have allowed West a brief period to introduce a new announcer in an effort to hold the audience developed by Bell at KXDG. If West could not do so by March 1, 1996, the day Bell could have properly started announcing at KSYN, West would have had to suffer the financial consequences.

It ignores reality—and the evidence favorable to the judgment—to hold West had no "legitimate protectable interest" in the audience Bell attracted to KXDG. I therefore find no merit in Bell's first point.

Her second (and final) point reads:

"The trial court erred in ... enjoining ... Bell from engaging in any employment in the broadcast industry prior to February 29, 1996, within a 65 air-mile radius from ... West Group's tower location in Joplin, Missouri because it erroneously declared or applied the law relating to enforcement of restrictive covenants in that the trial court was acting as a court of equity and was required to balance the needs of the paties [sic] as well as the public and an application of that balancing test to the undisputed facts of this case clearly establishes as a matter of law that ... Bell's need to earn a living and the public's need to secure her presence in the labor pool outweighed any need of West ... to protect any legitimate business interest."

The point is based on *Grebing,* 613 S.W.2d 872, cited in the majority opinion. *Grebing* holds that covenants by employees not to compete with their employers after termination of employment are enforceable only if the restraint imposed by the covenant on the employee is reasonable. *Id.* at 874[1]. According to *Grebing,* the determination of reasonableness depends on the competing needs of the parties and the needs of the public. *Id.* at [2]. The majority opinion quotes a segment of *Grebing, id.* at [3], identifying those needs.

The first need listed in *Grebing* is the employer's need to protect legitimate business interests. In addressing Bell's first point, I concluded West had a legitimate business interest in listeners Bell attracted to KXDG.

Bell argues that West should have protected any such interest by paying her more money. Bell argues, "Thus point one of the balancing test is resolved strongly against [West]."

On that issue, the evidence shows West hired Bell at $5.00 per hour. A month or two after she took over the seven-to-midnight show, West raised her to $5.50 per hour. After the Arbitron ratings in August, 1995, Bell asked for a raise and was offered $6.00 per hour. About a week later, she resigned. Asked why, Bell (a university student) testified she "wasn't getting enough money for it to conflict with school."

Unquestionably, Bell's wages were relatively modest. However, the $6.00 per hour West offered in August, 1995, was twenty percent more than the salary at which she started just seven months earlier. Furthermore, Bell's desire to earn more money to compensate for the conflict between her employment and her studies does not extinguish West's right to protect its interest in listeners Bell attracted to KXDG. I therefore find no merit in Bell's argument that the first element of the *Grebing* test is resolved strongly against West.

The second need listed in *Grebing* is the employee's need to earn a living. Bell asserts this factor "is also balanced very heavily in [her] favor."

On that issue, the record reveals Bell obtained employment as a waitress after leav-

ing KXDG. Although there is no evidence about what she earned at that job, it is inferable that her wages and hours were more satisfactory to her than her wages and hours at KXDG. Bell held the waitress job until October 9, 1995, when she was hired at KSYN.

As noted earlier, the effect of the injunctive relief granted by the trial court was to bar Bell from employment in the broadcast industry for only 99 days, and only within a "65 airmile radius" of West's tower in Joplin. While exclusion from the broadcast industry for 99 days in the Joplin area undeniably hindered Bell's ability to earn income, it did not prevent her from doing so. She was unquestionably employable as a waitress, and that occupation was evidently more attractive to her than the job she left at KXDG.

Furthermore, on March 1, 1996, she was free to return to the broadcast industry in Joplin. Because of her high Arbitron rating at KXDG, her value as an announcer in the Joplin area was arguably greater when the injunction expired than it was thirteen months earlier when West hired her.[3] Consequently, I reject Bell's argument that the second factor in the *Grebing* test is heavily balanced in her favor.

The final need listed in *Grebing* is the public's need to secure the employee's presence in the labor pool. Other than arguing that her high Arbitron rating indicates the public enjoyed her performance, Bell makes no attempt to show that the third factor favors her.

In my judgment, the trial court did not improperly balance the equities in enforcing the noncompete covenant. As we have seen, Bell knew the noncompete covenant barred her from broadcasting at KSYN for 180 days after leaving KXDG. With praiseworthy candor, she testified:

"Q. Now, you have talked with your new boss [at KSYN] about this covenant,

is that right, before you went to work?

. . . .

A. Yes.

Q. Yeah. He told you, don't worry about it, his lawyers will take care of it? Isn't that what he said?

A. Yeah. He said he didn't believe it was enforceable, and so the lawyer, the legal system would take care of it."

As it turned out, what the boss prophesied came true in this court.

I am firmly convinced the trial court neither erroneously declared nor erroneously applied the law in any respect alleged in Bell's second point. Accordingly, I would affirm the judgment.

---

3. At the first hearing (November 16, 1995), Bell testified her salary at KSYN was $1,200 per month.